JAMES N. STOVALL v. STATE.

No. A-2191.   Opinion Filed March 3, 1920.

. (187 Pac. 815.)

*Appeal from County Court, Ottawa County;*

*Vern E. Thompson, Judge.*

James N. Stovall was convicted of a misdemeanor, and
he appeals.   Reversed, and cause remanded with direction
to dismiss.

*A. C. Towne,* for plaintiff in error.

The Attorney General and *R. McMillan,* Asst. Atty.
Gen., for the State.

PER CURIAM.   The conviction was for buying a pre-
tended title to real estate.   The sentence was a fine of $25
and costs.   The charging part of the information reads as
follows:

"That James N. Stovall did in Ottawa county and in
the state of Oklahoma, on or about the first day of Febru-
ary, in the year of our Lord one thousand nine hundred
and thirteen and anterior to the presentment hereof, com-
mit the crime of buying and taking a covenant and deed con-
veying a pretended title and right to land, the grantor not
having been in possession thereof, nor having taken the
rents and profits thereof for the space of one year before
the buying and taking of said pretended right and title to
certain lands in the manner and form as follows, to wit:

"That on the said date and in the said county and state,
the said James N. Stovall then and there being, did then
and there buy and take a warranty deed from Frank T.
Lamar and Florence E. Lamar, his wife, to himself there-
by buying and taking a pretended right and title to the

following described lands, situated in Ottawa county, to wit: The southwest quarter of the northwest quarter of the northeast quarter of section sixteen (16), and the east half of the southwest quarter of the northwest quarter of the northeast quarter of section sixteen (16), and the east half of the southwest quarter of the northwest quarter and the northwest quarter of the northeast quarter of the southwest quarter and the south half of the northeast quarter of the southwest quarter of section one (1), and all in township twenty-six (26), range twenty-three (23), east of the Indian base and meridian, containing sixty (60) acres of land.

"That the said Frank T. Lamar and Florence E. Lamar, his wife, grantors as aforesaid, or those through whom they claimed, had not been in possession of said lands or of the reversion or remainder thereof, nor had the said Frank T. Lamar and Florence E. Lamar, his wife, or those through whom they claimed, taken the rents and profits from said lands for the space of one year before the buying and taking of the pretended right and title to said lands by the said James N. Stovall, contrary to," etc.

The evidence, in substance, is as follows:

Lon Lambkin, register of deeds, testified that a certain deed is of record in his office, being dated January 25, 1913, said deed being made by F. T. Lamar and Florence E. Lamar, grantors, to J. N. Stovall, grantee, for the land described in the information.

W. I. Angel testified that he had been in possession under a deed from Priscilla Breedlove since February, 1909, of the south one-half northeast quarter of southwest quarter of northwest quarter, and the northeast quarter of southwest quarter of section 1, township 26, range 23, and that he had paid no rent to any one during that time; that Stovall notified him to give up possession of the land; and

that Stovall came and cut timber there, and tried to persuade him to rent the land to him. Witness did not know whether Mr. Stovall knew that the witness was in possession of the land when he took the deed from Lamar or not.

E. E. Price testified that he holds a deed to 20 acres ·of land that was a part of the Frank Lamar allotment, and that he sold it to A. A. Wyford in 1911, and that Mr. Wyford was to pay for it in one year the sum of $300; that Wyford failed to pay and no deed was ever made to him; Wyford is in possession of it, but does not claim any title; that he did not pay any rent to Lamar or any one else, as he did not know whether he was owner of the land or not, as the title is in controversy between Mrs. Breedlove and Mr. Stovall; that he had understood that the deed which the Breedloves made to him was no good, because the grantor, F. T. Lamar, was a minor under guardianship and was 14 months under age when he made the Breedlove deed; that witness tried to get a new deed from Frank Lamar when he sold the place to A. A. Wyford; that Lamar was in prison at McAlester, and he went there and tried to get a deed from him; Lamar wanted $200, and he would not give what Lamar wanted for it.

A. A. Wyford testified that he was in possession of the land known as a part of the Lamar allotment, and that he got possession from Mr. Price. Witness did not know whether Stovall knew, at the time he bought the land from Lamar, that witness was in possession of the land or not; and Stovall did not know anything about the contract with Price for the purchase of the land.

O. E. Fisher testified that he was in the employ of Mr. Stovall to look up some business for him; that witness was

present when the deed to Mr. Stovall was signed and made, and that he had the deed in his pocket at that time; that at the time the deed was made it was to be sent to the Citizens' State Bank at Fairland, Okla., and witness did not know whether Mr. Stovall paid the money or not; that witness had the deed recorded, and that witness got two deeds from Frank Lamar and wife, and he did not know which one they had reference to. Witness was asked to explain about both of them, but upon objection of the state he was not permitted to do so; the objection to the witness explaining how he got two deeds of the two different tracts was not allowed by the court.

Burchas Blackburn testified that he was in possession of about 10 acres of the Lamar allotment under a deed from Cal. James.

Mrs. Priscilla Breedlove testified that she bought the Frank T. Lamar allotment in 1909 and received the deed from the State Bank of Miami, consideration $350; that she sold 10 acres to Cal. James; 30 acres to W. I. Angel, and 20 acres to E. E. Price; that a man by the name of Tom Taylor, of Collinsville, Okla., procured the deed from Frank T. Lamar and Florence E. Lamar to her; that her husband acted as her agent, and Mr. Taylor as agent for the Lamars, in the transaction.

Pierce Howard testified that he received a collection from the prison at McAlester, Okla., upon J. M. Stovall from E. M. Fry, and that Mr. Stovall paid the collection and he delivered no paper to Stovall.

The state rested, and the defendant moved to strike out the testimony of the state on the ground that it fails to show that the defendant ever received the deed in question.

The testimony for the defense, in substance, is as follows:

As a witness in his own behalf, James N. Stovall testified: That he is a man with a family and is 55 years of age; that he is a farmer and recently moved to Oklahoma from Oregon; that he had contracted to buy ten acres of the Lamar allotment from the Breedloves, but, finding that Breedloves could make no title to the land, he employed Mr. Fisher to go to the prison at McAlester and procure a deed from Lamar for the 10 acres which he was living on; he had then been in the county about 40 days; that Lamar informed Fisher while negotiating that he had 60 acres more that he wanted to sell because he needed the money, and that 10 acres of the 60 was close to Fairland and the other was close to the 10 acres he had bought, and he offered to sell it for $10 an acre.

Lamar stated he had never made a deed to the land to any one, and he was in possession of it, and Fisher when he returned from the first trip to McAlester, told Stovall what Lamar had said to him about having the 60 acres and that he had never deeded it to anyone, and that he was in possession of it; and Fisher stated to Stovall that he told Lamar that he would take the land if Stovall did not, but finally prevailed on Stovall to buy it without seeing it; that he did not know that Mr. Price was in possession of any of the land or had a deed to any part of it, and that he did not know where the land was located only that it was near Fairland; that Price, after he had bought the land, came to him and told him he understood he had bought the Lamar land, and that if Lamar and his wife had signed the deed it was all right; that he and Wyford had a deed but that it was no good, but that he and Wyford

would like to fix it so they could get the land; that he had tried to get a deed from Lamar, but Lamar would not sign it for him; that witness knew nothing about any one being in possession of any of the land, and that he had bought it on the representation that Lamar had possession and had never made a deed to any one, and that he was the original allottee, and after he had bought it that in a conversation with Blackburn, who stated to witness that, "If you bought the land, you are ahead of me; I found out a year ago that I had no deed for it. I have been trying to get Cal. James to straighten it up, but he would not do it," and he (Blackburn) wanted to rent it for this year, and witness told him he could have it, and he said he would pay witness the customary rent, and wanted me to give him the first chance to buy it if I took a notion to sell it; that Mr. Angel, after being informed that Stovall had bought the land, agreed to rent the land for that year, but upon objection this testimony was stricken out. Witness testified that he paid $600 for 60 acres of land and he was a stranger in the country, and that he relied on Fisher's statement in buying the land; that Fisher had indicated on the plat where the land was located and that no one was in possession of any of it; that he did not get any abstract or examine the record, but relied solely on Fisher's statement as to what Lamar had told him.

O. E. Fisher testified that Lamar told him about having the 60 acres, and that he had possession of it and had never made a deed to it except to his stepfather, J. E. Birdsong, and Birdsong had delivered up this deed, and he made affidavit to that effect; that after getting the 10-acre deed, and after coming from McAlester, he told Stovall that Lamar had 60 acres more land that he wanted to sell

which was close to the 10 acres, that he had a clear title to it, and had possession of it, and that no one had a deed against it; that Walter Breedlove had been his guardian, and that he was now of age and had got into the prison, and that the land was doing him no good, and he wanted to sell it, and, if I would buy it, it would be the means of getting him out of prison; so I advised Stovall to buy it, as it was a bargain, and I told him all this and showed him the affidavit I had from Lamar; and upon my statements as to what Lamar had told me, and as to where the land was located, as stated by Lamar, I went back to Mc-Alester and procured the deed from Lamar, and also a sworn statement from both Lamar and his wife, and I had deed sent to Stovall on the payment of $600 to Lamar, and I went back to McAlester on some other business, and Lamar told me he had not received his money, which statement was struck out by the court.

A. A. Wyford testified that he heard a conversation between Blackburn and Stovall in which Blackburn told Stovall that he was glad Stovall had bought the land, that his title was bad and they might now get it fixed up, and that he would lease the land from Mr. Stovall.

It is said that the evidence is insufficient to support the verdict, and for this reason the court erred in not directing a verdict for the defendant at the conclusion of the state's testimony.

Section 2260, Rev. Laws 1910, defining the crime of champerty, does not apply to restricted Indian Lands. The Congress has reserved the exclusive right to control the sales and prescribe the conditions to which title to these lands may pass. *Murrow Indian Orphans' Home v. Mc-*

*Clendon,* 64 Okla. 205, 166 Pac. 1101; *Miller et al. v. Grayson et al.,* 64 Okla. 122, 166 Pac. 1077.

In the case of *Pitt v. State,* 16 Okla. Cr. 15, 180 Pac. 383, it is said that, where there is an entire absence of evidence to show whether the party in possession of such lands claims title under a void or valid deed to the same, the prosecution must fail for lack of necessary evidence to sustain the same, and a motion by the defendant to direct a verdict in his favor should have been sustained.

For the reason stated in the opinon of *Pitt v. State, supra,* the judgment of the lower court is reversed, and the cause remanded, with direction to dismiss.